UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. _____ |
| ) | |
| SPECTRO ALLOYS CORPORATION ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **COMPLAINT**

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the United States Environmental Protection Agency ("U.S. EPA"), alleges as follows:

### **NATURE OF THE ACTION**

1.     This is a civil action brought under Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), ("the Act," or "the CAA") for injunctive relief and the assessment of civil penalties against Defendant Spectro Alloys Corporation ("Spectro" or "Defendant") for violations of the Act arising from Spectro's non-compliance with the National Emission Standards for Hazardous Air Pollutants ("NESHAP") for secondary aluminum processing, codified at 40 C.F.R. Part 63, Subpart RRR.  The violations at issue in this action occurred at Spectro's Rosemont, Minnesota secondary aluminum processing facility.

## JURISDICTION, VENUE, AND NOTICE

2.    This Court has jurisdiction over the subject matter and over the parties pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355(a).

3.    Authority to bring this action is vested in the United States Department of Justice, pursuant to Section 305(a) of the Act, 42 U.S.C. § 7605(a), and pursuant to 28 U.S.C. §§ 516 and 519.

4.    Venue lies in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b) and 1395(a) because the alleged violations occurred within this district at a facility located in Rosemont, Minnesota.

5.    Notice of the commencement of this action has been given to the Minnesota Pollution Control Agency in accordance with Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## DEFENDANT

6.    Spectro is incorporated under the laws of the State of Minnesota and does business in the State of Minnesota.  At all times relevant to this Complaint, Spectro owned and operated a Secondary Aluminum Production Facility, as that term is defined in 40 C.F.R. § 63.1503, located at 13220 Doyle Path in Rosemont, Minnesota.

## STATUTORY AND REGULATORY BACKGROUND

### Clean Air Act

7.    The Clean Air Act establishes a regulatory scheme to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

NESHAPs

8.      Congress has established a list of hazardous air pollutants ("HAPs"), which includes, among others, hydrochloric acid ("HCl"). 42 U.S.C. § 7412(b)(1).  Under Section 112(b)(2) of the Act, 42 U.S.C. § 7412(b)(2), EPA periodically reviews the list of hazardous air pollutants and, where appropriate, revises the list by rule.

9.      Section 112(c) of the Act, 42 U.S.C. § 7412(c), requires the U.S. EPA Administrator to publish a list of all categories and subcategories of major sources and certain area sources of the hazardous air pollutants listed pursuant to 42 U.S.C. § 7412(b).

10.     Section 112(d) of the Act, 42 U.S.C. § 7412(d), requires the EPA Administrator to promulgate regulations establishing emission standards for each category and subcategory of major sources and area sources of HAPs.  These emission standards are called the National Emission Standards for Hazardous Air Pollutants ("NESHAPs").  Numerous "source categories" are regulated under the NESHAPs, including, for example, coke oven batteries (40 C.F.R. Part 63, Subpart L), dry cleaning operations (40 C.F.R. Part 63, Subpart M), and the printing industry (40 C.F.R. Part 63, Subpart KK).

11.     The NESHAPs apply to facilities that are "major sources" of HAPs, 40 C.F.R. § 63.1500(b), which are sources or groups of stationary sources located within a contiguous area and under common control that emit or have the potential to emit ten tons per year or more of any HAP, or twenty-five tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2.  An "area source" is any stationary source of HAPs that is not a major source.  42 U.S.C. § 7412(a)(2).  A "stationary source" is any building, structure, facility, or installation that emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (by reference to 42 U.S.C. § 7411(a)).

- 3 -

12.     Sections 113(a)(3) and (b) of the Act, 42 U.S.C. § 7413(a)(3), (b) prohibit violations of any NESHAP regulation. Thus, a violation of a NESHAP regulation is a violation of the Act.

NESHAP for Secondary Aluminum Production

13.     On March 23, 2000, EPA promulgated the NESHAP for Secondary Aluminum Production, which is set forth at 40 C.F.R. Part 63, Subpart RRR ("Subpart RRR").  65 Fed. Reg. 15,690 (Mar. 23, 2000).

14.     The requirements of Subpart RRR apply to the owner or operator of a "secondary aluminum production facility," 40 C.F.R. § 63.1500(a), which is defined as "any establishment using clean charge, aluminum scrap, or dross from aluminum production, as the raw material and performing one or more of the following processes:  scrap shredding, scrap drying/delacquering/ decoating, thermal chip drying, furnace operations (i.e., melting, holding, sweating, refining, fluxing, or alloying), recovery of aluminum from dross, in-line fluxing, or dross cooling."  40 C.F.R. § 63.1503.

15.     Subpart RRR applies to specified affected sources located at a secondary aluminum production facility that is a major source of HAPs.  These affected sources include aluminum scrap shredders, thermal chip dryers, scrap dryers, delacquering kilns, group 1 furnaces, and secondary aluminum processing units, all of which are defined at 40 C.F.R. § 63.1503.  40 C.F.R. § 63.1500(b).

16.     The owner or operator of an existing affected source was required to comply with the requirements of Subpart RRR by March 24, 2003.  40 C.F.R. § 63.1501(a).

Title V Permit

17.     Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources." The purpose of Title V is to ensure that all "applicable requirements" for compliance with the Act, including NESHAP requirements, are collected in one place.

18.     The Minnesota Pollution Control Agency Title V operating permit program was approved by EPA on May 2, 1995. These regulations are currently codified at Minn. R. 7007.0050 – 7007.1850.

19.     Pursuant to Minn. R. 7007.0250(2)(B), an owner or operator of a major stationary source subject to a standard under the National Emission Standards for Hazardous Air Pollutants must obtain a state permit from the Minnesota Pollution Control Agency.

20.     The Minnesota Pollution Control Agency has adopted and incorporated by reference the National Emission Standards for Hazardous Air Pollutants for Secondary Aluminum Production found in Subpart RRR.  Minn. R. 7007.7665.

21.     A permit issued by the Minnesota Pollution Control Agency under Minn. R. 7007.0050 – 7007.1850 includes emissions limitations, operational requirements, and other provisions needed to ensure compliance with all applicable requirements at the time of permit issuance.  The permit also requires the permittee to comply with all emissions monitoring and analysis procedures or test methods required under the applicable requirements, including any procedures and methods promulgated pursuant to section 114(a)(3) or 504(b) of the Act.  Minn. R. 7007.0800.

22.     The United States may enforce any condition or provision in a Title V permit issued by the Minnesota Pollution Control Agency unless otherwise specified in the Title V permit.  Minn. R. 7007.1750.

23.     Pursuant to Section 502(a) of the Act, 42 U.S.C. § 7661a, it is unlawful for a major source to operate in violation of a permit issued under Title V of the Act, 42 U.S.C. § 7661 *et seq*.  *See also* 40 C.F.R. § 70.7(b) and Minn. R. 7007.0150.

<u>Enforcement</u>

24.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the United States to commence a civil action for the assessment of a civil penalty of up to $25,000 per day for each violation whenever any person violates any requirement of the Act.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2641 note, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 note, the United States may seek civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997. Pursuant to EPA's 2004 and 2008 Civil Monetary Penalty Inflation Adjustment Rules, the United States may seek civil penalties of up to $32,500 per day for each violation occurring on or after March 16, 2004, and civil penalties of up to $37,500 per day for each violation occurring on or after January 13, 2009.  40 C.F.R. Part 19.

## GENERAL ALLEGATIONS

<u>Secondary Aluminum Production Facility</u>

25.     At all times relevant to this Complaint, Spectro has been a "person" within the meaning of Section 302(3) of the Act, 42 U.S.C. § 7602(e).

26.     At all times relevant to this Complaint, Spectro has owned and operated a Secondary Aluminum Production Facility ("SAPF") within the meaning of 40 C.F.R. § 63.1503,

- 6 -

located at 13220 Doyle Path in Rosemont, Minnesota.  At the facility, Spectro processes mixed aluminum scrap to produce various secondary aluminum products.

27.     At all times relevant to this Complaint, Spectro's SAPF has been, and continues to be, an "affected source" and an "existing source" within the meaning of 40 C.F.R. § 63.2.

28.     At all times relevant to this Complaint, Spectro's SAPF has been, and continues to be, a "major source" of HAPs as defined in Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1) and 40 C.F.R. § 63.2.

29.     At all times relevant to this Complaint, Spectro has held and continues to hold a Title V Operating Permit No. 03700066-001 issued by the Minnesota Pollution Control Agency and covering Spectro's secondary aluminum production facility at 13220 Doyle Path, Rosemount, Minnesota.

Group 1 Furnaces

30.     At all times relevant to this Complaint, Spectro's SAPF has contained, and continues to contain, two Group 1 furnaces as defined in 40 C.F.R. § 63.1503 that are identified as Furnace #1 and Furnace #3.

31.     Spectro's Group 1 furnaces are Secondary Aluminum Processing Units as defined in 40 C.F.R. § 63.1503, and each of the Group 1 furnaces is a separate Emission Unit as defined in 40 C.F.R. § 63.1503.

32.     At all times relevant to this Complaint, Spectro's Furnace #1 and Furnace #3 have been equipped with a single common lime-injected fabric filter, as that term is defined in 40 C.F.R. § 63.1503.

33.     At all times relevant to this Complaint, Spectro's SAPF has performed reactive fluxing, as that term is defined at 40 C.F.R. § 63.1503, at one or more of its Group 1 furnaces.

Scrap Dryers

34.     At all times relevant to this Complaint, Spectro's SAPF has contained, and continues to contain, two scrap dryers/delacquering kilns/decoating kilns as defined in 40 C.F.R. § 63.1503 that are identified as Scrap Dryer #1 and Scrap Dryer #3.

35.     At all times relevant to this Complaint, Spectro's Scrap Dryer #1 and Scrap Dryer #3 have each been equipped with, and continue to each be equipped with, an afterburner and a lime-injected fabric filter, as those terms are defined in 40 C.F.R. § 63.1503.

36.     At all times relevant to this Complaint, Spectro's Scrap Dryer #1 and Scrap Dryer #3 have each been equipped with, and continue to each be equipped with, a bag leak detection system, as that term is defined in 40 C.F.R. § 63.1503.

Hazardous Air Pollutants

37.     Group 1 furnaces and scrap dryers/delacquering kilns/decoating kilns at an SAPF emit or have the potential to emit dioxin and furans ("D/F"), hydrochloric acid ("HCl"), and particulate matter ("PM") as those terms are defined in 40 C.F.R. § 63.1503.

38.     Dioxins and furans are hazardous air pollutants. See 42 U.S.C. § 7412(b). There is scientific evidence that dioxins and furans are potential human carcinogens.

39.     Hydrochloric acid is a hazardous air pollutant. See 42 U.S.C. § 7412(b). HCl is corrosive to the eyes, skin, and mucous membranes of humans. Inhalation of HCl may cause coughing, hoarseness, inflammation and ulceration of the respiratory tract, and chest pain. Because of its corrosive nature, HCl is also damaging to personal property, as well as plants and animals.

40.     Particulate matter from an SAPF contains hazardous metals, including, among others, arsenic, beryllium, cadmium, chromium, cobalt, mercury, nickel and selenium. 40 C.F.R.

§ 63.1503. Measuring PM from an SAPF acts as a surrogate for measuring the individual HAP

metals. *Id.* The Subpart RRR regulations limit these PM emissions. See 40 C.F.R. § 1505(i)(2).

## FIRST CLAIM FOR RELIEF

<u>Failure to Design a Capture and Collection System
In Accordance with ACGIH Manual</u>

41.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

42.     At times relevant to this Complaint, Spectro owned and operated, and continues to

own and operate, affected sources and emission units equipped with add-on air pollution control

devices at its SAPF.

43.     As required by 40 C.F.R. § 63.1506(c), an owner or operator of an affected source

or emission unit equipped with an add-on air pollution control device must design and install a

system for the capture and collection of emissions to meet the engineering standards for

minimum exhaust rates as published by the American Conference of Governmental Industrial

Hygienists in Chapters 3 and 5 of "Industrial Ventilation: A Manual of Recommended Practice"

23rd edition ("ACGIH Manual"), which is incorporated into Subpart RRR by reference at 40

C.F.R. § 63.1502.

44.     Spectro has failed to design and install a capture and collection system that meets

the engineering standards for minimum exhaust rates as published in Chapters 3 and 5 of the

ACGIH manual.

45.     By failing to design and install an adequate capture and collection system, Spectro

has been, and continues to be, in violation of 40 C.F.R. §§ 63.1506(c) and 63.1515(b)(5).

46.     Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under § 502(a) of the Act.

47.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

## SECOND CLAIM FOR RELIEF

Failure to Inspect Capture and Collection System
In Accordance with ACGIH Manual

48.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

49.     At times relevant to this Complaint, Spectro owned and operated, and continues to own and operate, affected sources and emission units equipped with add-on air pollution control devices at its SAPF.

50.     As required by 40 C.F.R. § 63.1510(d), an owner or operator must install, operate, and maintain a capture/collection system for each affected source and emission unit equipped with an add-on air pollution control device, and inspect each capture/collection and closed vent system at least once each calendar year to ensure that each system is operating in accordance with the operating requirements in §63.1506(c) and record the results of each inspection.

51.     At times relevant to this Complaint, Spectro has failed to properly inspect its capture/collection and closed vent system at least once each calendar year to ensure that each

system is operating in accordance with the operating requirements in §63.1506(c) and record the results of each inspection.

52.     By failing to properly inspect its capture/collection and closed vent system, Spectro has been, and continues to be, in violation of 40 C.F.R. § 63.1510(d).

53.     Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under  § 502(a) of the Act.

54.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

### THIRD CLAIM FOR RELIEF

#### HCl Emissions Exceedance:  Scrap Dryer #1

55.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

56.     Subsection 63.1505(d) of the Subpart RRR regulations prohibits an owner of a scrap dryer/delacquering kiln/decoating kiln from discharging or causing to be discharged into the atmosphere emissions in excess of 0.40 kg of HCl per Mg (0.80 lb per ton) of feed/charge from a scrap dryer/delacquering kiln/decoating kiln at a SAPF that is a major source. Notwithstanding the provision in paragraph (d), Subsection 63.1505 paragraph (e) permits an owner or operator of a scrap dryer/delacquering kiln/decoating kiln to discharge up to 0.75 kg of HCl per Mg (1.50 lb per ton) of feed/charge from a scrap dryer/delacquering kiln/decoating kiln at a SAPF that is a major source if the scrap dryer/delacquering kiln/decoating kiln is equipped

with an afterburner having a design residence time of at least 1 second and the afterburner is operated at a temperature of at least 760° C (1400 ° F) at all times.

57.     Spectro's Scrap Dryer #1 is a scrap dryer/delacquering kiln/decoating kiln equipped with an afterburner having a design residence time of at least 1 second, and the afterburner is operated at a temperature of at least 760° C (1400° F) at all times.

58.     Beginning no later than February 3, 2009, Spectro's Scrap Dryer #1 exceeded its HCl emissions limit of 0.75 kg per Mg (1.50 lb per ton) of feed/charge in violation of 40 C.F.R. § 63.1505(e).  Since at least February 3, 2009, Spectro has lacked sufficient mechanisms or control technologies to ensure compliance with the applicable emissions limit for HCl, and, more likely than not, has violated that emission limit on one or more days when Scrap Dryer # 1 has been in operation.

59.     Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under § 502(a) of the Act.

60.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

## FOURTH CLAIM FOR RELIEF

D/F Emissions Exceedance:  Scrap Dryer #1

61.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

62.     Subsection 63.1505(d) of the Subpart RRR regulations prohibits an owner of a scrap dryer/delacquering kiln/decoating kiln from discharging or causing to be discharged into the atmosphere emissions in excess of 0.25 μg of D/F TEQ per Mg ($3.5 \times 10^{-6}$ grams TEQ per ton) of feed/charge from a scrap dryer/delacquering kiln/decoating kiln at a SAPF that is a major source.  Notwithstanding the provision in paragraph (d), Subsection 63.1505 paragraph (e) permits an owner or operator of a scrap dryer/delacquering kiln/decoating kiln to discharge up to 5.0 μg of D/F TEQ per Mg ($7.0 \times 10^{-5}$ grams TEQ per ton) of feed/charge from a scrap dryer/delacquering kiln/decoating kiln at a SAPF that is a major source if the scrap dryer/delacquering kiln/decoating kiln is equipped with an afterburner having a design residence time of at least 1 second and the afterburner is operated at a temperature of at least 760° C (1400 ° F) at all times.

63.     Spectro's Scrap Dryer #1 is a scrap dryer/delacquering kiln/decoating kiln equipped with an afterburner having a design residence time of at least 1 second, and the afterburner is operated at a temperature of at least 760° C (1400° F) at all times.

64.     Beginning no later than February 18, 2009, Spectro's Scrap Dryer #1 exceeded its D/F emissions limit of 5.0 μg of D/F TEQ per Mg ($7.0 \times 10^{-5}$ grams TEQ per ton) of feed/charge in violation of 40 C.F.R. § 63.1505(e).  Since at least February 18, 2009, Spectro has lacked sufficient mechanisms or control technologies to ensure compliance with the applicable emissions limit for D/F, and, more likely than not, has violated that emission limit on one or more days when Scrap Dryer # 1 has been in operation.

65.     Spectro failed to report the D/F emissions exceedance within 48 hours to the Minnesota Pollution Control Agency, as required by the Minnesota State Implementation Plan Rules, codified at Minnesota Rule 7019.1000.

66.     Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under § 502(a) of the Act.

67.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

### FIFTH CLAIM FOR RELIEF

Monitor Failures and Temperature Excursions:
Scrap Dryer #1 and Scrap Dryer #3 Afterburners

68.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

69.     As required by 40 C.F.R. § 63.1510(g), the owner or operator of an affected source using an afterburner must install, calibrate, maintain and operate a device to continuously monitor and record the operating temperature of the afterburner.

70.     Additionally, 40 C.F.R. § 63.1506(g) requires that the owner or operator of a scrap dryer/delacquering kiln/decoating kiln with emissions controlled by an afterburner must maintain the 3-hour block average operating temperature of each afterburner at or above prescribed limits established during a performance test.

71.     At times relevant to this Complaint, Spectro has, on numerous occasions, failed to operate and maintain devices to continuously monitor and record the operating temperature of the afterburners associated with Scrap Dryer #1 and Scrap Dryer #3.

72.     Additionally, at times relevant to this Complaint, Spectro has, on numerous occasions, failed to maintain the 3-hour block average operating temperature of the afterburners associated with Scrap Dryer #1 and Scrap Dryer #3 at or above prescribed limits.

73.     By failing to maintain and operate devices to continuously monitor and record the temperature of its afterburners, and by failing to maintain the temperature of its afterburners within prescribed limits, Spectro has been and continues to be in violation of 40 C.F.R. §§ 63.1510(g) and 61.1506(g).

74.     Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under § 502(a) of the Act.

75.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

## SIXTH CLAIM FOR RELIEF

### Monitor Failures and Temperature Excursions: Scrap Dryer #1 and Scrap Dryer #3 Fabric Filters

76.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

77.     As required by 40 C.F.R. § 63.1510(h), the owner or operator of a scrap dryer/delacquering kiln/decoating kiln using a lime-injected fabric filter must install, calibrate, maintain and operate a device to continuously monitor and record the temperature of the fabric filter inlet gases.

78.    Additionally, 40 C.F.R. § 63.1506(g) requires that the owner or operator of a scrap dryer/delacquering kiln/decoating kiln with emissions controlled by an afterburner must maintain the 3-hour block average inlet temperature for each fabric filter at or below prescribed limits established during a performance test.

79.    At times relevant to this Complaint, Spectro has, on numerous occasions, failed to operate and maintain devices to continuously monitor and record the operating temperature of the lime-injected fabric filters associated with Scrap Dryer #1 and Scrap Dryer #3.

80.    Additionally, at times relevant to this Complaint, Spectro has, on numerous occasions, failed to maintain the 3-hour block average inlet temperature for its fabric filters associated with Scrap Dryer #1 and Scrap Dryer #3 at or below prescribed limits.

81.    By failing to maintain and operate devices to continuously monitor and record the temperature of its lime-injected fabric filters associated with Scrap Dryer #1 and Scrap Dryer #3, and by failing to maintain the inlet temperature for its fabric filters associated with Scrap Dryer #1 and Scrap Dryer #3 at or below prescribed limits, Spectro has been and continues to be in violation of 40 C.F.R. §§ 63.1510(h) and 61.1506(g).

82.    Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under § 502(a) of the Act.

83.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

- 16 -

## SEVENTH CLAIM FOR RELIEF

Monitor Failures and Temperature Excursions:
Furnace #1 and Furnace #3 Fabric Filter

84.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

85.     As required by 40 C.F.R. § 63.1510(h), the owner of a group 1 furnace using a lime-injected fabric filter must install, calibrate, maintain and operate a device to continuously monitor and record the temperature of the fabric filter inlet gases.

86.     Additionally, 40 C.F.R. § 63.1506(m) requires the owner or operator of a group 1 furnace with emissions controlled by a lime-injected fabric filter to maintain the 3-hour block average inlet temperature for each fabric filter at or below prescribed limits established during a performance test.

87.     At times relevant to this Complaint, Spectro has, on numerous occasions, failed to operate and maintain devices to continuously monitor and record the temperature of the fabric filter inlet gases for the lime-injected fabric filter associated with Furnace #1 and Furnace #3.

88.     Additionally, at times relevant to this Complaint, Spectro has, on numerous occasions, failed to maintain the 3-hour block average inlet temperature for the fabric filter associated with Furnace #1 and Furnace #3 at or below prescribed limits.

89.     By failing to maintain and operate devices to continuously monitor and record the temperature of its lime-injected fabric filter associated with Furnace #1 and Furnace #3, and by failing to maintain the inlet temperature for its fabric filter associated with Furnace #1 and Furnace #3 at or below prescribed limits, Spectro has been and continues to be in violation of 40 C.F.R. §§ 63.1510(h) and 61.1506(g).

90.     Additionally, the violations set forth above constitute violations of Spectro's Title

V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability

under § 502(a) of the Act.

91.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set

forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for

each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on

or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13,

2009.

### EIGHTH CLAIM FOR RELIEF

Monitor Failures and Chlorine Injection Rate Excursions:
Furnace #1 and Furnace #3

92.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

93.     As required by 40 C.F.R. § 63.1510(j), the owner or operator of a group 1 furnace

must install, calibrate, operate and maintain a device to continuously measure and record the

weight of gaseous or liquid reactive flux injected to each affected source or emission unit.

94.     Additionally, 40 C.F.R. § 63.1506(m) requires the owner or operator of a group 1

furnace controlled by a lime-injected fabric filter to maintain the total reactive chlorine flux

injection rate for each operating cycle at or below limits established during a performance test.

95.     At times relevant to this Complaint, Spectro has, on numerous occasions, failed to

operate and maintain a device to continuously measure and record the weight of gaseous or

liquid reactive flux injected to Furnace #1 and Furnace #3.

96.     Additionally, at times relevant to this Complaint, Spectro has, on numerous occasions, failed to maintain the total reactive chlorine flux injection rate for each operating cycle for Furnace #1 and Furnace #3 at or below prescribed limits.

97.     By failing to maintain and operate devices to continuously measure and record the weight of gaseous or liquid reactive flux injected into Furnace #1 and Furnace #3, and by failing to maintain the total reactive chlorine flux injection rate at or below prescribed limits, Spectro has been and continues to be in violation of 40 C.F.R. §§ 63.1510(j) and 63.1506(m).

98.     Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under § 502(a) of the Act.

99.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

## NINTH CLAIM FOR RELIEF

### Bag Leak Detection System Failures:
### Scrap Dryer #1 and Scrap Dryer #3

100.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

101.     As required by 40 C.F.R. § 63.1510(f), the owner or operator of an affected source or emission unit using a fabric filter or lime-injected fabric filter to comply with the requirements of Subpart RRR must install, calibrate, maintain and continuously operate a bag leak detection system or a continuous opacity monitoring system.

- 19 -

102.   At times relevant to this complaint, Spectro has, on numerous occasions, failed to maintain and continuously operate a bag leak detection system or a continuous opacity monitoring system associated with Scrap Dryer #1 and Scrap Dryer #3.

103.   By failing to maintain and continuously operate a bag leak detection system or a continuous opacity monitoring system associated with Scrap Dryer #1 and Scrap Dryer #3, Spectro has been and continues to be in violation of 40 C.F.R. § 63.1510(f).

104.   Additionally, the violations set forth above constitute violations of Spectro's Title V permit issued by the Minnesota Pollution Control Authority, and subject Spectro to liability under § 502(a) of the Act.

105.   As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Spectro to injunctive relief and a civil penalty of up to $27,500 per day for each violation occurring before March 16, 2004, $32,500 per day for each violation occurring on or after March 16, 2004, and $37,500 per day for each violation occurring on or after January 13, 2009.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States respectfully requests that this Court:

(a)   Issue an injunction requiring Spectro to remedy its past and current noncompliance with the Clean Air Act and the NESHAP requirements and to comply prospectively with all applicable requirements;

(b)   Assess civil penalties against Spectro for up to the amounts provided in the Act for each day of violation of the Act;

(c)   Award the United States its costs and disbursements in this action; and

(d)   Grant such other relief as this Court deems just and proper.

- 20 -

Respectfully submitted,

THE UNITED STATES OF AMERICA

Date: _4/4/10_

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

Date: _3/6/2012_

NIGEL B. COONEY
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
Telephone: 202-514-3145

OF COUNSEL:

PADMAVATI G. BENDING
Associate Regional Counsel
EPA, Region 5 (C-14J)
77 West Jackson Blvd.
Chicago, IL  60604
(312) 353-8917